**In re GURNEY'S INN CORP. LIQUIDATING TRUST, Debtor.**

**Bankruptcy No. 097–72326–511.**

United States Bankruptcy Court, E.D. New York.

Dec. 1, 1997.

Pinks & Arbeit by Steven G. Pinks, Hauppauge, NY, for Debtor.

Moritt, Hock & Hamroff by Marc Hamroff and Thomas Rund, Garden City, NY, for HAC I.

Pryor & Mandelup by Randolph White, Westbury, NY, for Gurney's Inn Resort & Spa, Ltd.

Stan Yang, Office of United States Trustee, Garden City, NY.

## DECISION

### *(Motion to Dismiss )*

MELANIE L. CYGANOWSKI, Bankruptcy Judge.

Before the Court is the motion by HAC 1, Inc. ("HAC") to dismiss the voluntary petition filed by Gurney's Inn Corp. Liquidating Trust ("Gurney's Trust") on June 23, 1997 on the ground that the Court lacks jurisdiction because Gurney's Trust is not eligible for relief under chapter 11 since it is not a "business trust." The sole issue is

whether the Debtor is a business trust. If it is, it is eligible for relief under chapter 11. If not, then this Court lacks subject matter jurisdiction and the case must be dismissed. *North Fork Bank v. Abelson,* 207 B.R. 382 (E.D.N.Y.1997) (a finding that a trust is not a business trust would deprive the bankruptcy court of subject matter jurisdiction).[1]

### *A Review of the Governing Standards and Caselaw*

The burden is on the party alleging bankruptcy court jurisdiction to establish its existence. *In re Verrazano Holding Corp.,* 86 B.R. 755 (Bankr.E.D.N.Y.1988). Thus, the Debtor in this case bears the burden of showing that it is an eligible business trust, *In re Westgate Village Realty Trust,* 156 B.R. 363 (Bankr.D.N.H.1993), though the petitioning creditors would bear this burden if this were an involuntary petition filed against an alleged debtor. *In re Secured Equipment Trust of Eastern Air Lines,* 38 F.3d 86 (2d Cir.1994).

Beginning with a review of the relevant statutes, 11 U.S.C. § 109(d) provides:

> Only a person that may be a debtor under chapter 7 of this title, except a stockbroker or a commodity broker, and a railroad may be a debtor under chapter 11 of this title.

11 U.S.C. § 101(41) provides:

> "person" includes individual, partnership, and corporation, but does not include governmental unit....

11 U.S.C. § 101(9) provides: "corporation"—

> (A) includes—
>
> > (i) association having a power or privilege that a private corporation, but not an individual or a partnership, possesses;
> >
> > (ii) partnership association organized under a law that makes only the capital subscribed responsible for the debts of such association;

---

**1.** The subject matter over which federal judicial authority extends is set forth in Article III of the United States Constitution. The jurisdiction of lower federal courts is further limited to those subjects expressed in a statutory grant of jurisdiction: in this case, 28 U.S.C. § 157 and the Bankruptcy Code. As a consequence, "no action of the parties can confer subject-matter jurisdic- tion upon a federal court. Thus, the consent of the parties is irrelevant, principles of estoppel do not apply, and a party does not waive the requirement by failing to challenge jurisdiction early in the proceedings." *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982) (citations omitted).

(iii) joint-stock company;

(iv) unincorporated company or association; or

(v) business trust; but

(B) does not include limited partnership.

Prior to the enactment of the Bankruptcy Code, Section 1 of the Bankruptcy Act of 1898 defined the term "corporation" to include trusts "wherein beneficial interest or ownership is evidenced by certificate or other written instrument." The language was construed to mean transferrable certificates. However, the Code, in its definition of corporation, removed the reference to the structure of beneficial ownership and simply refers to a "business trust." The legislative history underlying the Code's definition of "corporation" makes clear that, except for a "business trust," a trust is not a "person" eligible for bankruptcy relief. *In re Medallion Realty Trust*, 103 B.R. 8, 10 (Bankr. D.Mass.1989), *aff'd*, 120 B.R. 245 (D.Mass. 1990). Nonetheless, the legislative history sheds little light on the meaning of the term "business trust." *Cutler v. The 65 Security Plan*, 831 F.Supp. 1008 (E.D.N.Y.1993).

■ Moreover, the cases are divided as to whether state[2] or federal law applies to determine whether the entity is a business trust. *Cutler v. The 65 Security Plan, supra*. In *Cutler*, Judge Weinstein concluded that

a competing, more extensive, and generally more persuasive body of law has relied on the need for national uniformity and vindication of the federal bankruptcy policy to fashion a definition of "business trust." As one court reasoned,

Whether an entity is eligible for relief ... is purely a matter of federal law. To hold otherwise would result in different results in different states and an entity would be eligible for relief in one state but not in another. Clearly this is not what Congress intended when it enacted Article I, § 8, Cl. 4 of the Constitution which provides that "Congress shall have the power ... to establish ... uniform laws of the subject of bankruptcies."

*Cutler, supra*, 831 F.Supp. at 1015 (quoting *In re Arehart*, 52 B.R. 308 (Bankr.M.D.Fla. 1985)).

The Debtor cites *In re Sung Soo Rim Irrevocable Intervivos Trust*, 177 B.R. 673 (Bankr.C.D.Cal.1995), for the proposition that the Court must determine (1) whether state law recognizes a separate entity called a business trust, and (2) whether the debtor qualifies as a business trust under the relevant state law requirements. *See* Debtor's Mem., at 4. The Debtor is correct that the *Sung Soo Rim* court stated the same. The *Sung Soo Rim* court further states, however, that:

The inquiry could stop here. That would be appropriate if the determination of formal compliance with state law requirements were to be given conclusive effect on the issue of eligibility, as would be the case if the issue were the creation or definition of enforceable property rights. On substantive rights, state law governs and binds federal bankruptcy court. But the availability of access to the federal bankruptcy courts and the availability of bankruptcy relief itself are ultimately questions of federal, not state, law. Standing to file a bankruptcy case—which is what "eligibility" really means—is a procedural question, not a substantive one. The states have no right to open or close the door to federal bankruptcy relief.

177 B.R. at 676 (citations omitted).

■ This Court concludes that the better view is that the question of eligibility is de-

---

**2.** N.Y. Gen. Ass'n L. § 2(2) defines a "business trust" as "any association operating *a business* under a written instrument or declaration of trust, the beneficial interest under which is divided into shares represented by certificates." N.Y. Gen. Ass'n Law § 2(2) (McKinney 1994) (emphasis added).

Under New York law, the distinction between a business trust and a nonbusiness trust "is that between an entity used to make profit (directly or indirectly) and one used to effect a gift or trans-

fer of property." *Denmark Cheese Ass'n v. Hazard Advertising Co.*, 59 Misc.2d 182, 298 N.Y.S.2d 98, 100 (Sup.Ct.), *modified on other grounds*, 33 A.D.2d 761, 305 N.Y.S.2d 1019 (1969). Although the Debtor asserts that it is a business trust under New York law largely because its trust certificates are "fully tradeable," *see* Mem. of Law in Opp. to Creditor's Motion to Dismiss Ch. 11 Proceeding ("Debtor's Mem."), at 3, New York law, in consonance with federal law, requires that the Debtor be "operating a business."

termined by reference to federal and not state law.

Even the cases making the eligibility determination solely by reference to the Bankruptcy Code, however, are divided on the meaning of "business trust." In fact, the Court of Appeals for the Second Circuit has recently acknowledged that the cases are "hopelessly divided." *In re Secured Equipment Trust of Eastern Air Lines*, 38 F.3d 86, 89 (2nd Cir.1994) (quoting *Cutler v. The 65 Security Plan, supra*, 831 F.Supp. at 1014). Some cases hold that the term means a trust which is deemed a corporation for income tax purposes under the test set forth in *Morrissey v. Commissioner*, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263 (1935). That test requires an analysis of six factors: (1) the trust must have been created and maintained for the purpose of conducting a business and sharing profits; (2) the trustees must hold title to the property; (3) there must be centralized management; (4) the continuity of beneficial interests must be uninterrupted by death of the beneficial owners; (5) beneficial interests must be transferable without affecting the continuity of the enterprise; and (6) personal liability of the participants must be limited. *See, e.g., In re Mosby*, 61 B.R. 636, 638 (E.D.Mo.1985), *aff'd*, 791 F.2d 628 (8th Cir. 1986); *see also Cutler v. The 65 Security Plan, supra*, 831 F.Supp. at 1016 (and cases cited therein).

Other cases have focused upon the trust's actual operations to determine "whether they include substantial business activities, disregarding the terms of the creating document." *See, e.g., In re Gonic Realty Trust*, 50 B.R. 710 (Bankr.D.N.H.1985). The court in *In re Medallion Realty Trust*, 103 B.R. 8, 11–12 (Bankr.D.Mass.1989), *aff'd*, 120 B.R. 245 (D.Mass.1990), stated that the test should be "whether the trust was created to transact business for the benefit of investors." The *Medallion Realty* court further held that by using the simple phrase "business trust," Congress intended to permit bankruptcy relief "for all trusts which are created for the purpose of transacting business and whose

beneficiaries make a contribution in money or money's worth to the enterprise, without regard to whether the trust has characteristics of a corporation such as separate certificates of ownership." *Id.* at 11–12. Applying this standard, the *Medallion Realty* court reviewed the circumstances and found that the trust in that case was created to combine the talents and resources of two people in the purchase of real estate, development and sale of homes. One of the beneficiaries contributed money to the enterprise, the other his expertise as real estate broker. There were no transferrable certificates issued; assignments were subject to a right of first refusal; all income was to be paid immediately to the beneficiaries; and there was limited liability for the participants. The trust at issue had developed and sold over 200 lots and homes, and had employed over 20 people. Under those circumstances, the *Medallion Realty* court held that the trust was an eligible debtor.[3]

In *In re Gonic Realty Trust*, 50 B.R. 710 (Bankr.D.N.H.1985), Judge Yacos concluded that Congress effected a substantive change with respect to the determination of "business trust" at the time of enacting the Code, and that the lack of transferable shares is no longer a relevant factor upon which to base a decision. Reviewing the case law, Judge Yacos concluded that, while the cases uniformly rule that a trust must be found to be conducting a business of some kind in order to come within the statute, the analysis is fact-specific, and the cases no longer stand for the general proposition that an entity may be deemed to be a business trust if a certain specified list of factors exist. In *Gonic*, the trust documents empowered the trustee to take all actions necessary to hold, preserve and manage all trust property, to "conduct the business of the trust," to grant leases and mortgages, to make loans, to make arrangements with tenants, to compromise any claims involving trust property, and to pay all expenses. The trust owned a mill complex, including machinery, equipment and supplies. It leased out portions of the mill to commercial and industrial tenants. It main-

---

**3.** The ultimate finding by the *Medallion Realty* court was that the debtor was, in reality, a partnership. However, the court also concluded that had it been found to be a trust, it would be an eligible "business trust."

tained the premises, providing heat and repairs, and had trade payables from various suppliers of fuel oil, electrical service, security services, snow-plowing, elevator repairs, water, telephone. It had no employees but operated entirely by use of independent contractors. It obtained a new tenant, and entered into a transaction whereby the tenant borrowed sums from a bank, with Gonic putting up the real property as collateral. Based upon these facts, Judge Yacos held that the trust was conducting business, and was therefore eligible for relief under Chapter 11.

In an early Code case, the distinction between business trusts and nonbusiness trusts was laid out in an oft-cited statement:

> Business trusts are created for the purpose of carrying on some kind of business or commercial activity for profit; the object of a nonbusiness trust is to protect and preserve the trust res. The powers granted in a traditional trust are incidental to the principal purpose of holding and conserving particular property, whereas the powers within a business trust are central to its purpose.

*In re Treasure Island Land Trust,* 2 B.R. 332, 334 (Bankr.M.D.Fla.1980); *see also In re Metro Palms I Trust* 153 B.R. 922 (Bankr. M.D.Fla.1993).

A review of the factual circumstances in the *Treasure Island* case shows the trust was not created by a grant of a settlor, but was formed through the voluntary association of unrelated persons and subscriptions sold through a prospectus. The beneficial interests were very much like shares, in that they were equal in value, held by a large number of people in varying amounts, and were transferrable. However, the trust instrument itself rejected any construction as a business trust, as it explicitly stated that the trustee could not transact business of any kind, and that the agreement should not be deemed to be or create or evidence the existence of a business trust. The debtor was unable to point to any business activity in which it was actively engaged, and, indeed, had engaged in a course of conduct which precluded a finding that it was in business: it had obtained a ruling from the SEC that allowed it to avoid the registration requirements of the federal securities law, arguing that the collection of assessments was necessary to preserve the assets of the trust.

Another case that illustrates the fact-specific analysis of the courts is *In re Metro Palms I Trust,* 153 B.R. 922, 923 (Bankr. M.D.Fla.1993). The sole asset of the debtor in *Metro Palms* was a commercial office building, leased for commercial space. The debtor's sole business activity was to supervise the management of the property, and it engaged a management company for that purpose. It had no employees, one secured creditor, no priority creditors, and few unsecured creditors. The mortgagee moved to dismiss the petition on eligibility grounds. The *Metro Palms* court determined that the Debtor was eligible for relief, since the Debtor was established for the purpose of conducting business through the operation of the commercial office building, and not to merely preserve the trust *res* for the beneficiaries.

The focus of the court in *In re Vivian A. Skaife Irrevocable Trust Agreement # 1,* 90 B.R. 325 (Bankr.E.D.Tenn.1988), was upon the underlying trust documents. In that case, the court observed that examination of the trust documents is essential to a just determination of whether a trust qualifies as a business trust. "To hold otherwise ... would make eligibility for relief dependent upon the whim of the trustee. At any given time the trust might or might not be eligible for bankruptcy relief depending upon whether the trustee, in her discretion, was engaging in business operations rather than in one of the other options afforded her under ... the Trust Agreement." *Id.* at 328.

In the case of the *Skaife Irrevocable Trust,* the trust was formed by the grantor for the benefit of her two children and their spouses. Trust assets consisted of shares of stock in several corporations, a number of patents, and trademarks. The trust agreement directed the trustee to pay income to the beneficiaries, and empowered the trustee to invade the principal if the income was insufficient for their comfort and support. The trust agreement vested the trustee with broad discretionary powers, including to retain, sell and invest trust property, to borrow

money for any purpose, to mortgage and pledge trust property, to receive and comingle any other property, to purchase additional trust property, and to " 'operate, maintain, repair, rehabilitate, alter or remove any improvements on real estate.' " *Id.* at 327. The court found that the object and purpose of the trust was to provide assets for the comfort and support of the two beneficiaries, and that business activities were but one of the options to be considered by the trustee in promoting the purposes of the trust. The court therefore held that the trust was not a business trust and, as a result, was not eligible for relief under Chapter 11.

The recent decision by the Court of Appeals for the Second Circuit represented its first opportunity to consider the phrase "business trust." *In re Secured Equip. Trust of Eastern Air Lines*, 38 F.3d 86 (2d Cir.1994). The Second Circuit noted that most courts have looked to see whether the trust at issue has the attributes of a corporation (similar to the IRS test in *Morrissey, supra* ), and that most agree that business trusts are created for the purpose of carrying on some kind of business in contrast to the purpose of a nonbusiness trust which is generally to protect and preserve the *res* (*i.e.,* applying the test set forth in *Treasure Island, supra* ). However, the Second Circuit cautioned that "while a trust must engage in business-like activities to qualify as a business trust, such activity, without more, does not necessarily demonstrate that a trust is a business trust." *Secured Equip., supra*, 38 F.3d at 89. The Court also stated that regardless of whether generating a profit is a necessary element of a business trust, many courts have found the absence of a profit motive influential, and this factor is indeed relevant to a determination of whether a particular trust is a business trust. The Circuit did not, however, "foreclose the possibility that a trust that was not specifically established to generate a profit may still be considered a business trust." *Id.* at 90. Rather, the Court stated that the decision is based upon a "very fact-specific analysis of the trust at issue." *Id.* at 89. In this respect, the Court observed that the "inquiry must focus on the trust documents and the totality of the circumstances, not solely on

whether the trust engages in a business." *Id.* at 90–91.

The Trust at issue in the *Secured Equip.* case was created to facilitate Eastern Airline's ability to obtain financing with a lien on a portion of its fleet of planes. The mechanics of the transaction were as follows: the Trust sold $500 million in trust certificates to investors, and used the proceeds to purchase a portion of Eastern's plane fleet. It then leased the planes to Eastern, in exchange for rent payments equal to the amount of principal and interest on the certificates. Upon a default by Eastern in the payment of rent, the trust could take possession of the planes and hold, sell, keep or lease the planes in order to enforce the trust indenture. On these facts, the Circuit concluded that it was not a business trust eligible for relief under Chapter 11. First, the Court noted that the trust was not established to generate a profit, but to secure repayment of the certificateholder's loans to Eastern. As such, "its purpose was to preserve the interest that the certificateholders had already been guaranteed, not to generate it." *Id.* at 90. In addition, the trust was not established to "transact business" in the ordinary sense of the phrase. Any business that the trust was engaged in was deemed merely "incidental to the Trust's sole responsibility of protecting the certificateholders' security interest." *Id.*

### The Arguments of the Parties

The primary thrust of HAC's argument is that Gurney's Trust does not qualify as a business trust because its own trust documents prohibit it from transacting business. HAC further points out that the Debtor is nothing more than a repository, established to collect mortgage payments if and when they are ever paid to it. As such, HAC argues that Gurney's Trust does no business and could not, under any definition, be considered a business trust.

In opposing the motion, the Debtor places great emphasis on the fact that, upon its formation, it issued certificates that are freely transferable. It also urges that the phrase "business trust" is a term of art and that courts have recognized that a business trust need not conduct business in a tradi-

tional fashion. In this respect, Gurney's Trust relies heavily upon *In re Cooper Properties Liquidating Trust,* 61 B.R. 531 (Bankr. W.D.Tenn.1986), and attempts to analogize its situation to the trust in that case. In *Cooper Properties,* the trust was formed by a grantor corporation. The corporate shareholders had chosen to liquidate and had formed a trust for the purpose of receiving the assets. It was clear in *Cooper Properties* that the trust had been formed in order to comply with (and therefore benefit from) certain IRS regulations which provided that no gains would be recognized if assets, less assets retained to meet claims, were completely distributed. In addition, the trust in *Cooper Properties* was established as a successor to the grantor to wind up the affairs of the corporation. The trustee was authorized to sell or rent property, to collect rents and accounts receivable, to ascertain the trust's debts and to pay same. For these reasons, the court concluded that the trust was "for all practical purposes an association with the powers and privileges of a private corporation." *Id.,* 61 B.R. at 536. As a result, the court held that the *Cooper Properties* trust was an eligible debtor under Chapter 11.

Gurney's Inn Resort & Spa, Ltd. ("Gurney's Limited"), an entity related to the Debtor which is itself a Chapter 11 debtor before this Court,[4] presents four objections: (1) that dismissal of the Gurney's Trust case would jeopardize its own efforts to reorganize; (2) that dismissal of this case is inequitable in that it would result in a windfall to HAC; (3) that HAC's argument in this Court regarding the ineligibility of Gurney's Trust is inconsistent with its claim, in a state court proceeding, that Gurney's Trust was authorized to execute the guarantee which gave rise to the debt owed to HAC; and (4) that HAC is judicially estopped from challenging

the standing of Gurney's Trust as a business trust in view of its successful argument in state court that the guarantee is a legally binding obligation entered into by the Debtor.

## DISCUSSION

The relevant facts central to a determination of the issue raised by HAC's motion are largely undisputed. *See, e.g.,* Affidavit of Marc L. Hamroff, sworn to August 28, 1997 (the "Hamroff Aff."), and the exhibits annexed thereto; Affidavit of Paul Montemarano, sworn to October 9, 1997 ("Montemarano Aff."). The Court therefore concludes that an evidentiary hearing is not required and that the motion may be resolved based on the papers and the oral arguments of the parties presented on November 20, 1997.

It is undisputed that HAC holds a judgment (entered with the County Clerk's Office of Suffolk County on April 2, 1997) in the amount of $559,953.07, plus applicable interest, against Gurney's Trust. Hamroff Aff. ¶ 3. The judgment arises out of the Debtor's guaranty of a $350,000 note executed by New York Resort Timeshare Management Corp. ("NY Management").[5] *Id.* HAC claims that the only asset of Gurney's Trust is a second mortgage alleged in the Debtor's petition to have a current market value of $10,500,000. Prior to the filing of the Debtor's bankruptcy petition, HAC levied on the mortgage. *Id.* The Debtor filed for bankruptcy protection on the eve of the anticipated sale of the mortgage by the Suffolk County Sheriff.

The Debtor claims that it owns assets in addition to the second mortgage. Primary among them is the power to appoint the members of the board of directors of Gurney's Limited.[6] Montemarano Aff. at ¶¶ 5, 6.

---

**4.** *See In re Gurney's Inn Resort & Spa, Ltd.,* Case No. 094–72933–511. Gurney's Limited is also party to the mortgage held by the Debtor and is the entity whose board is controlled by the Debtor by virtue of the latter's alleged power to appoint the directors of Gurney's Limited. *See* Montemarano Aff. at ¶ 5; *see also* n. 6, *infra.*

**5.** NY Management is also related to Gurney's Trust and is a debtor before this Court. *See In re New York Resort Timeshare Management Corp.,* Case No. 093–73828–511. The case was convert-

ed from Chapter 11 to Chapter 7 by Order entered on May 14, 1996.

**6.** In a related proceeding, HAC disputes the claim by Gurney's Trust that it has the right and power to appoint the members of the board of directors of Gurney's Limited. HAC's motion is pending on reserve before the Court. *See* Order to Show Cause Why an Order Should Not be Entered (A) Permitting HAC 1, INC. to Make an Application to Appoint a Majority of the Board of Directors of Limited and to Receive Payments to

The relationship between the Gurney's entities is explained, as follows, by the Debtor:

For approximately 60 years prior [sic] to 1982, Gurney's Inn. Corp. (["Gurney's] Corp.") owned the Gurney's Inn Resort & Spa in Montauk, New York. In 1982, Gurney's Inn Resort & Spa, Ltd. (["Gurney's] Limited") was formed as a New York State time sharing cooperative. The formation occurred pursuant to an offering plan by which 51 group time sharing interests containing 109 time share units were authorized by the New York State Attorney General to be offered for sale.

Pursuant to the time share plan, [Gurney's] Limited was authorized to and did issue two classes of stock. Class A stock was issued and sold to the time share owners who own collectively 450,985 shares. Class B stock is presently held by the Debtor's nominee herein as additional security for the payment of a purchase money second mortgage in the reduced principal amount of $15,089,782.00. The mortgage encumbers the resort property. The second mortgage was originally conveyed to [Gurney's] Corp. pursuant to the time share agreement between [Gurney's] Corp. and [Gurney's] Limited. The mortgage, pursuant to the Liquidating Trust agreement, was transferred by [Gurney's] Corp. to the Debtor herein. Under the terms of the mortgage, the Debtor herein is now the owner of all of the Class B stock.

By the terms of the time share offering plan, the Debtor herein is now the controlling shareholder of [Gurney's] Limited. The Debtor has the sole right to elect all directors of [Gurney's] Limited and it is [sic] the directors of Ltd. who have control over the operation of Ltd.'s business. The Debtor has selected two of the three man board of Ltd. and has allowed Class A shareholders to select one member. In affect [sic], the Debtor, through the board

members of Ltd. selected by it, is operating the business of Ltd.

Montemarano Aff., ¶¶ 3–5. In addition to urging that it conducts business as a result of its authority to appoint the board members of Gurney's Limited, the Debtor claims that its assets include a lien on the unsold time share units and a mortgage on a nearby piece of property used as a tennis club.[7] *Id.,* ¶ 6.

In other words, Gurney's Corp. owned the Gurney's resort until it sold the fee to the timeshare corporation, Gurney's Limited. Upon that sale, Gurney's Corp. took back a purchase money second mortgage, ceased any further business purpose, and converted to Gurney's Trust, to which the purchase money second mortgage was transferred. *See* Hamroff Aff. at ¶ 5; *see also* Exhibit B annexed to Hamroff Aff. at 1.

Gurney's Limited then issued Class A stock to timeshare owners. Class B stock was also issued as additional security for the payment of the purchase money second mortgage, and is presently held by Gurney's Trust's nominee.

The underlying "Agreement and Declaration of Trust, dated March 31, 1983" (the "Trust Agreement"), which established the Debtor, is annexed as Exhibit B to the moving papers. By its terms, it recites that Gurney's Corp. chose to liquidate "pursuant to IRC Section 337" and that a plan of liquidation was adopted by the shareholders "pursuant to which all remaining assets and liabilities of Gurney's [Corp.] are being transferred to this Liquidating Trust [*i.e.,* the Debtor]." *See* Exhibit B at 1. As the recital further states:

The shareholders of Gurney's [Corp.] have voted to dissolve Gurney's [Corp.], wind up its affairs, and distribute its assets to its shareholders, and because the transfer of undivided interests in its assets and

---

Section 506(b) of the Bankruptcy Code; (B) Finding that HAC 1, Inc. is Entitled to Appoint Two of the Three Directors to the Board of Directors of Limited.... For the sole purpose of this motion, the Court will assume that Gurney's Trust possesses the authority to appoint the directors of Gurney's Limited. The Court's assumption for this limited purpose is not, howev-

er, intended to reflect any findings of fact or conclusions of law with respect to this issue.

**7.** HAC does not dispute that the Debtor owns these additional assets; for the purposes of this motion, the Court will therefore assume that the Debtor's assertions are true.

liabilities would be impractical (the assets of Gurney's [Corp.] are not now saleable at a fair price and are not reasonably susceptible to sale or division to shareholders) have voted to have the assets and liabilities distributed by Gurney's [Corp.] to Trustees to be held in trust for the benefit of the shareholders in order to preserve the property and collect the principal and income therefrom for the shareholders....

*Id.* Included among the assets transferred from Gurney's Corp. to the Trust was the purchase money mortgage made by Gurney's Limited in the principal amount of $18,249,-844.37 which was subordinated to the first mortgage. Hamroff Aff. at ¶ 5.

Article VI of the Trust Agreement sets forth the purpose of the Trust and the limitations placed upon its trustees. It states, in pertinent part, as follows:

6.1 PURPOSE OF TRUST. The sole purpose of this Trust is to receive by assignment all the assets and liabilities of Gurney's [Corp.] and to conserve and protect the Trust Estate and collect and distribute the income and proceeds to the Trust Certificate holders after the payment of or provision for, expenses and liabilities.

6.2 LIMITATIONS ON TRUSTEES. The Trustees shall not at any time, on behalf of the Trust or Trust Certificate holders, enter into or engage in any business. This limitation shall apply irrespective of whether the conduct of any such business activities is deemed by the Trustees to be necessary or proper for the conservation and protection of the Trust Estate.... The Trustees shall be restricted to the holding and collection of the Trust Moneys and its payment and distribution for the purposes set forth in this Agreement and to the conservation and protection of the Trust Estate and the administration thereof in accordance with the provisions of this Agreement.
....

Exhibit B at 10–11; *see also* Montemarano Aff. at ¶ 6. The Debtor does not deny the limitations enunciated in its Trust Agreement, but urges that it is nonetheless "doing more than simply holding and preserving assets." Montemarano Aff. at ¶ 6. It points to the control by its trustees over Gurney's Limited, a "multi-million dollar resort," in order to ensure the largest recovery possible for its certificate holders and claims that the "business transactions in which the Trust is engaged are similar to the businesses of any corporation which is winding up its affairs." *Id.*

In contrast to its arguments in opposing HAC's motion to dismiss, the Debtor describes its business *in its petition* as the "[o]wner of mortgage on resort property as spendthrift trust to receive and collect funds pursuant to trust agreement." *See* Voluntary Petition of Debtor, annexed as Exhibit D, at 1. Moreover, Exhibit A to the Debtor's Petition describes the Debtor's business purpose as having been "established as part of a time share plan and as recipient of the assets of Gurney's Inn Corp." *Id.* A further review of the Debtor's Petition and Schedules shows that the Debtor has no employees, no payroll or operating expenses, no executory contracts and insignificant income from "employment or operation of a business." *See Id.,* Rule 11 Affidavit of Lola Montemarano, a trustee, sworn to on June 17, 1997; Exhibit A to Petition; and Statement of Financial Affairs. The Debtor's description of its business activities on its petition is consistent with testimony given by Nicholas Montemarano at a deposition taken in aid of HAC's enforcement of its judgment wherein he admitted that Gurney's Trust is

not a business, there is no income, there is no expense. There might be expenses, but there is no business.

Tr. of Nicholas Montemarano, taken on May 13, 1997, at 18, lines 2–5 (annexed as Exhibit E to Hamroff Aff.).[8]

The Montemarano statements are also consistent with the position taken by the Debtor in the state court proceeding in which HAC and it have battled. *See HAC 1, Inc. v.*

---

8. The Court was not provided with a sworn copy of the Montemarano deposition transcript. The Debtor has not, however, refuted the statements reflected in the transcript filed in connection with this motion.

*Gurney's Inn Restaurant Corp., Gurney's SPA Corp. d/b/a Institut De Beaute, Nicholas Montemarano as Trustee of Gurney's Inn Corp. Liquidation Trust and as Executor of the Estate of Joyce Montemarano and Angelo Montemarano,* Supreme Court of the State of New York, County of Suffolk (Index No. 95–19779) (the "State Court Action"). Throughout the State Court Action, the Debtor has maintained that its "sole purpose" is "to receive assets, conserve them, and pay out income and proceeds to the Trust's Certificate holders." Affirmation of Francis J. Donovan, at ¶ 11 (annexed as Exhibit A to HAC's reply). Similarly, in papers filed with the Appellate Division, Second Department, the Debtor has described its Trust Agreement in the following manner:

> The first excerpt states the purpose of the Trust. The sole purpose of the Trust is to receive assets, conserve them, and pay out income and proceeds to Trust Certificate holders. The second excerpt reenforces the obligation to conserve the assets by prohibiting the Trustees from engaging in any business, "irrespective of whether the conduct of any such business activities is deemed by the Trustees to be necessary or proper for the conservation and protection of the Trust Estate."

*See* Appellant's Brief at 11–12, annexed as Exhibit B to HAC's reply.

 Upon consideration of all the factual circumstances surrounding the formation and existence of Gurney's Trust, and with an eye towards "the trust documents and the totality of the circumstances," *see Secured Equip. Trust of Eastern Air Lines, supra,* 38 F.3d at 90–91, the Court cannot avoid the conclusion that this Debtor is not a business trust within the meaning of section 101(9) of the Bankruptcy Code. By its own words, the Trust Agreement charges the Debtor's trustees with "conserv[ing] and protect[ing] the Trust Estate" and expressly prohibits them from "enter[ing] into or engag[ing] in any business." *See* Article VI, §§ 6.1, 6.2 (annexed as Exhibit B to Hamroff Aff.). Even those cases which have recognized that a liquidating trust may be considered a business trust, *see, e.g., In re Cooper Properties Liquidating Trust,* 61 B.R. 531 (Bankr. W.D.Tenn.1986); *but see In re Hemex Liquidation Trust,* 129 B.R. 91 (Bankr.W.D.La. 1991), have been careful to distinguish cases in which the trust document itself rejects any construction of the trust as a business trust. *See, e.g., In re Tru Block Concrete Products, Inc.,* 27 B.R. 486 (Bankr.S.D.Cal.1983). The liquidating trust cases are therefore distinguishable, since the trust documents in the present case expressly *prohibit* the trustees from engaging in any business.

Nor does the Court believe that the Trust was "established to 'transact business' as that phrase is commonly interpreted." *In re Secured Equip. Trust, supra,* 38 F.3d at 90. Since its formation, the only business to which the Trust can point is its acquisition of the second mortgage (which it received at the time of its formation as a result of the dissolution of Gurney's Corp.) and its alleged authority to appoint members of the board of directors of Gurney's Limited.[9] While it may be said that the members of the board of directors of Gurney's Limited operate the business of *Gurney's Limited,* the Court disagrees with the conclusion urged by the

---

9. In its opposition, Gurney's Limited points to a guaranty, executed by Gurney's Trust in favor of HAC's predecessor on the first mortgage (the Whitestone Savings Bank, N.A.) in connection with a sprinkler loan to N.Y. Management, as an example of the Debtor "doing business." See Objections to Motion to Dismiss Chapter 11 Case, at 3–4. Based on the guaranty, Gurney's Limited urges that HAC should be judicially estopped in this Court from asserting that the Debtor is not engaged in business. The Court disagrees. First, as noted earlier, "no action of the parties can confer subject-matter jurisdiction upon a federal court ... [and] principles of estoppel do not apply...." *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Gui-nee, supra,* 456 U.S. at 702, 102 S.Ct. at 2104. Second, and equally important, the Court does not perceive any inconsistency between HAC's two positions. To the contrary: HAC's state court argument, namely, that the Gurney's Trust guarantee of the "sprinkler loan" is a valid and binding obligation, is fully consistent with its assertion here that any business in which Gurney's Trust engages is a necessary collary of its mandate to protect and preserve the trust *res. Compare In re Secured Equip. Trust, supra,* 38 F.3d at 88, 90 (fact that trustee was "actively managing, maintaining, marketing, leasing and selling" aircraft was incidental to trust's sole responsibility of protecting its security interest).

Trust that the same can be translated into the operation of a business by *Gurney's Trust.* In fact, the Trust's own papers acknowledge that the board of directors of Gurney's Limited are "operating the business *of Ltd.*" *See* Montemarano Aff. at ¶5 (emphasis supplied). Rather, the Court agrees with HAC that any of the rights and powers granted to the trustees are incidental to the purpose of the Trust, which is to protect and preserve the value of the mortgage for the Trust beneficiaries.

In addition, the structure of the transaction which resulted in the formation of the Trust in the present case differs significantly from the structure of the transaction in the typical case. Here, the shareholders of Gurney's Corp., which originally owned the resort complex, desired to convert the resort to a time-sharing entity. It therefore "conveyed its resort to a time-sharing entity formed for the purposes of selling and managing the resort as a time-share enterprise." *See* Debtor's Mem. at 1. The corporation sold the resort to Gurney's Limited, and took back a mortgage, becoming a creditor. The resort, with all of its assets, operations, profit and investment potential, was transferred to an entity *other than* this Debtor (*i.e.,* to Gurney's Limited). The corporation's only remaining asset, the mortgage, was then transferred to this Debtor, with instructions to "collect the principal and income therefrom" for the shareholders. This structure is telling, and precludes a finding that Gurney's Trust was formed for the purpose of carrying on the business of Gurney's Corp.

For all of the foregoing reasons, HAC's motion is granted in its entirety. This Debtor is not a "business trust" and is therefore not eligible for relief under chapter 11.

Counsel for HAC is directed to settle an Order consistent with this decision within ten days hereof.